In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor.

In re PETITION OF HOTEL WALDORF-ASTORIA CORPORATION.

No. 70–347.

United States District Court, E. D. Pennsylvania.

Nov. 10, 1971.

Blank, Rome, Klaus & Comisky by Gilbert Stein and Gerald Broker, Philadelphia, Pa., for the Trustee, Penn Central Transportation Co.

Clark, Ladner, Fortenbaugh & Young by W. Charles Hogg, Jr., Philadelphia, Pa., and Royall, Koegel & Wells by Frederick P. Glick, Robert E. Frisch and William J. O'Brien, II, New York City, for Hotel Waldorf-Astoria Corp.

Fox, Rothschild, O'Brien & Frankel by Nochem S. Winnet, Philadelphia, Pa., for First National City Bank of New York.

Tate & Ervin by W. Bourne Ruthrauff, Philadelphia, Pa., for Richard Joyce Smith, Trustee, New York, New Haven & Hartford Railroad.

In Proceedings for the Reorganization of a Railroad

OPINION AND ORDER NO. 484

FULLAM, District Judge.

The Trustees of the Debtor own the fee title to the Waldorf-Astoria Hotel in the City of New York. This property, comprising an entire block bounded by 49th and 50th Streets and by Park Avenue and Lexington Avenue, is presently leased to the Hotel Waldorf-Astoria Corporation under a long-term lease. A dispute has arisen as to the proper method of determining the rentals due and payable under this lease, and the matter has been submitted to this Court for decision. For convenience, the lessor will be referred to as "the Railroad,"

and the tenant will be referred to as "the Hotel."

Under date of September 1, 1929, the Railroad leased the property to the Hotel for a term of 26 years and 11 months (January 1, 1930 to December 1, 1956), with renewal options for two additional terms of 21 years each. This document will be referred to as "the original lease." The Railroad contributed approximately $10,000,000 toward the cost of construction of the Hotel building. The original lease required the Hotel to pay a fixed annual ground rental, "sinking fund rental" at the rate of 2% per year on the $10,000,000 construction advance, and a "building rental" representing 6% annual interest on the unpaid balance of the $10,000,000. The Hotel was also required to pay a stated portion of taxes, and certain other charges. The Hotel was also required to supply, maintain and replace furnishings and equipment, and to add to them from time to time as necessary for the operation of the establishment as a first-class luxury hotel.

The building was completed and the Hotel opened for business in October 1931, but immediately experienced financial difficulties. On June 30, 1934, the Hotel filed a petition for reorganization under Section 77B of the Bankruptcy Act, in the United States District Court for the Southern District of New York.

As of December 31, 1934, the Hotel was in arrears in the payment of ground rentals, building rental and taxes in the total amount of $3,418,806.76, and in the payment of sinking fund rentals in the amount of $599,900. In addition, the Hotel was in arrears on its bond interest.

Ultimately, a plan of reorganization was adopted, and approved by the reorganization court as of January 3, 1936. Under the terms of the plan, the rental arrearages were cancelled, and a new lease was entered into; and the Railroad received title to the furniture and furnishings of the Hotel.

In essence, the new lease provided for sliding scale rentals, dependent upon the profitability of the Hotel operations. In conformity with the plan of reorganization, the new lease provided for a substantial reduction in rental at such time as an "equality date" might be reached. It is the determination of this "equality date" which gives rise to the present controversy.

According to the Trustees' calculations, as of December 31, 1970, additional payments aggregating $14,826,618.68 would be required before the "equality date" is reached; whereas, the Hotel claims that the equality date was attained in November of 1970, resulting in an overpayment for the year 1970 in the sum of $226,488.50, plus additional sums since that date.

The reorganization plan, at page 4, provided:

*"Future Adjustment of Rent.* The New Lease will provide that if the aggregate of the rentals (in addition to taxes and service charges) received by the Landlord under the Original Lease to the effective date of the New Lease and of the rentals received by the Landlord under the New Lease, and under any Renewals, shall, at any time equal the aggregate of the following (the time when such event may occur being herein called the Equality Date):

"(1) the sums which would have been payable as Ground Rental under the Original Lease, and the renewals thereof, assuming the Original Lease, and the renewals thereof, to have continued to the Equality Date;

"(2) the sum of $10,000,000 advanced by the Landlord towards the cost of the construction of the building, with simple interest on the unpaid balances of said amount at the rate of 6% per annum from the date of each advance on account thereof to the date of full payment thereof;

"(3) interest at the rate of 5% per annum compounded semi-annually on the amounts by which the aggregate

of the Ground Rental payable or which would have been payable under the Original Lease, and the renewals thereof, assuming the Original Lease, and the renewals thereof, to have continued to such Equality Date, and the aforesaid interest on the sum of $10,000,000 shall, at the end of each six months' period during the term or renewal term or terms of the New Lease, be in excess of the aggregate of the rentals (in addition to taxes and service charges) received by the Landlord under the Original Lease to the effective date of the New Lease and under the New Lease, the renewals thereof, from the effective date of the New Lease, on account thereof to such date. . . ."

It is to be noted that these three items together comprise what would have been paid under the original lease, plus interest on the unpaid balances.

The plan provided that, upon attainment of the equality date, the annual rent thereafter payable would be reduced to what would have been the ground rental under the original lease, or the sum of $800,000, whichever is greater. The plan also provided that "the landlord will retransfer the leased personal property to the Hotel upon the equality date, in the event provided for in the section of this plan entitled Future Adjustment of Rent."

The plan provided that the new lease was to become effective as of January 1, 1935.

In conformity with the plan of reorganization, the new lease (executed December 10, 1936, but effective as of January 1, 1935) specifically provided (paragraph SEVENTEENTH of the present lease):

"That in case the aggregate of the rentals (in excess of the payments on account of taxes and service charges), *received by the Lessor under the original lease prior to January 1, 1935,* plus the payments on account of the New Basic Rental and the Gross Earnings Rental received by the Les-

sor under the Amended Lease subsequent to January 1, 1935, and under this lease and any renewal thereof, herein called the Return under the Amended Lease, shall at any time equal the aggregate of the following (the time when such event may occur being herein called the Equality Date, and the total of the sums mentioned in subdivisions (1), (2) and (3) following being herein called the Return under the Original Lease) . .." (Emphasis added.)

There is no dispute about calculation of the aggregate of the three items which must be paid before the equality date is attained. The sole issue here involved is whether the transfer of the furniture from the Hotel to the Railroad, by bill of sale executed December 10, 1936, should be credited toward "rentals . . . received by the lessor under the original lease prior to January 1, 1935 . . .." I am satisfied that it should not, and that the Trustees' calculations are correct.

The Hotel's position may be summarized as follows: As of December 31, 1934, the furniture had a net book value of $2,654,817.24. In accordance with the plan of reorganization, the Hotel, on December 10, 1936, transferred title to the furniture to the Railroad; and the Railroad contemporaneously executed a release, discharging the Hotel from its obligation to pay rental then in arrears in the sum of $3,418,806.76, and also executed a covenant not to sue, with respect to the "sinking fund rentals" arrearage in the sum of $599,900. The Railroad set up this transaction on its books as receipt of the furniture "in consideration for" the release of the rental arrears; the Railroad thereafter paid income tax on that amount, and ultimately paid state and local sales and use tax based upon its outright ownership of the furniture. While the Railroad did not claim depreciation on the furniture in its income tax returns, its reasons were not inconsistent with outright ownership of the furniture. Rental may be paid otherwise than in cash. Therefore, the

Hotel's argument runs, the transfer of the furniture to the Railroad should be treated as a payment on account of rentals due under the original lease, in calculating the equality date under the new lease.

One difficulty with this approach is that it does not square precisely with the language of the lease, or the antecedent reorganization plan. The transfer of furniture on December 10, 1936, simply does not constitute "rentals . . . received by the lessor under the original lease prior to January 1, 1935 . . . ." The furniture was not received prior to January 1, 1935, and it was not received under the lease, but rather under the reorganization plan. It seems reasonably clear that, if the parties had intended the result the Hotel now seeks, precise language would have been included to accomplish it, particularly in view of the elaborate separate treatment of the furniture issue throughout the relevant documents.

The Trustees point out, with considerable force, that the furniture transaction did not constitute consideration flowing from the Hotel to the Railroad. The Hotel was in bankruptcy, had defaulted under the lease and under its bonds, and no longer had much of a claim to the furniture. The real dispute over the furniture, as the reorganization proceeding record demonstrates, was between the bondholders and the Railroad. It was in settlement of that dispute, as part of the reorganization plan, that the furniture transaction was carried out.

In my view, the basic weakness in the Hotel's position is the assumption that, if the Railroad became outright owner of the furniture and released the Hotel from its obligation to pay the rental arrearages, it necessarily follows that the furniture transaction should be credited in calculating the equality date under the new lease. This is a *non sequitur*. There is no inconsistency between cancellation of the Hotel's *obligation* to pay arrearages of rental under the original lease, and the notion that the Hotel would be required to pay these arrearages in order to get the furniture back and qualify for reduction of rent under the new lease.

Viewing the transaction in its entirety, it is abundantly clear that, as a result of the reorganization, the Hotel was forever discharged from any legal obligation to pay the rental arrearages under the original lease. Substituted for this obligation was the legal obligation to make the rental payments called for under the new lease. In addition, the Hotel was granted what amounted to an option to fulfill all of its obligations under the original lease, whereupon the parties would be placed in substantially the same position they would have been in had there been no reorganization. That is, on the equality date the Hotel would get its furniture back, and the rental would be reduced to reflect the fact that the Railroad would then have recouped its original investment plus interest.

It must be emphasized that, when the equality date is reached, the Railroad is required to retransfer the furniture to the Hotel. This provision is totally inconsistent with the notion that the original receipt of the furniture by the Railroad is to be credited on account of the equality date calculation. The Hotel seeks to explain this provision by contending, on the one hand, that the retransfer to the Hotel on the equality date would be only minimally beneficial to the Hotel; and, on the other hand, that this represents a bonus or incentive payment, by which the Railroad sought to encourage the Hotel to become profitable. I regard these theories as fanciful in the extreme.

It is undoubtedly correct that the Hotel has expended several million dollars in additions and replacements, pursuant to the terms of the lease, so that a substantial portion of the furniture which would be returned to the Hotel on the equality date has been paid for by the Hotel in the interim. It is also clear, however, that the Railroad has contributed heavily to these additions and replacements, since such payments are de-

ductible in the calculations which form the basis for determining rental under the new lease.

The assertion that bare legal title to the furniture is of little consequence to the Hotel, since the furniture must remain in the Hotel in any event, carries no greater weight than the corresponding assertion which can be made by the Railroad, namely, that the transfer of title to the furniture in 1936 was of little significance, since, as a practical matter, the furniture had to remain in the Hotel. The fact is, that the Hotel has had the use of the furniture over the years, and that this was advantageous to both parties.

For the foregoing reasons, I have concluded that the language of the relevant documents is unambiguous, that the true intent of the parties is clearly reflected therein, and that there is therefore no need to resort to extraneous evidence of the conduct of the parties, in resolving the present issue. Nevertheless, I am also satisfied that the actions of the parties over the years lend further support to the Trustees' position.

The Railroad and its predecessors submitted periodic accountings showing the equality date calculation. In none of these was the furniture transaction credited as a payment on account of rental. On various occasions, the Hotel expressly declined to attempt its own calculation, or its evaluation of the Railroad's calculation, on the theory that the equality date was so remote as not to justify the expense involved in such calculation. On other occasions, the Hotel submitted its own accounting and calculation of the equality date, making no claim that the furniture should have been credited. Exhibit T–1 is one such accounting, calculated as of December 31, 1964, submitted to the Railroad by the Hotel on October of 1970. Exhibit T–2 is another such accounting, calculated as of December 31, 1970, submitted by the Hotel to the Railroad on July 1, 1971, with a covering letter which suggests, for the first time, "that the computation therein cannot be construed as a liability on the part of the Waldorf-Astoria as the interpretation of the lease relative to these accounts are subject to review and revision and that the rights of the Waldorf-Astoria are to make any corrections or modifications to such figures."

It is frankly conceded by the Hotel's counsel that the interpretation now sought to be advanced did not occur to anyone until the Summer of 1971, after the Hotel commenced detailed studies in anticipation of submitting a bid for the purchase of the property.

It has been stipulated that, if the furniture transaction is not credited, there remained a balance of $14,826,618.68, as of December 31, 1970, to be paid before the equality date is attained. The Order to be entered will effectuate this stipulation.

In deciding this matter, I have applied New York law, but I am satisfied that the result would be the same in any jurisdiction.